11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Stephanie
Phillips and Charley Dee Phillips

Appellants

Vs.                   No. 11-02-00181-CV -- Appeal from Brown County

Texas
Department of Protective and Regulatory Services

Appellee

 

After the jury had returned its verdict, the trial
court entered its order in accordance with that verdict terminating the
parent-child relationship between Stephanie Phillips and Charley Dee Phillips
and their child, A.P.  Because the
evidence is legally and factually sufficient to support the verdict and
judgment and because the trial court had jurisdiction of the case, we affirm.

Charley argues in his first issue on appeal that
the evidence is both legally and factually insufficient to support the verdict.  In Charley=s
second issue, he argues that the trial court did not have jurisdiction of the
case because it did not enter an appropriate order under TEX. FAM. CODE ANN. ' 263.401 (Vernon 2002).  Stephanie makes that same argument in her
sole issue on appeal.  We will discuss
the jurisdictional argument first.

Section 263.401(a) provides for the dismissal of
suits such as this under certain circumstances. 
If the trial court has neither entered a final order nor granted an
extension by the first Monday after the first anniversary of the date it
entered temporary orders appointing the Texas Department of Protective and
Regulatory Services (the Department) as temporary managing conservator, then it
shall dismiss a suit affecting the parent-child relationship filed by the
Department that requests termination of the parent‑child relationship or
that requests that the Department be named conservator of the child.








Section 263.401(b) contains provisions which allow
the trial court to extend the dismissal date and to retain the suit on the
docket for an additional period of 180 days if it finds that continuing the
appointment of the Department would be in the best interest of the child.  The order of extension must contain a new
date for dismissal that is not later than 180 days of the date called for in
Section 263.401(a).  The order must also
provide for further temporary orders as necessary for the protection of the
child and as necessary to avoid further delay. 
Further, the court must set forth in the order a date for a final
hearing; the date must be before the required date for dismissal.

Appellants claim that the trial court did not
enter an order that complied with Section 263.401.  On December 22, 2000, the trial court entered
temporary orders in which it appointed the Department as temporary managing
conservator of A.P.  On November 30,
2001, a permanency hearing was conducted. 
The trial court announced that it was extending the deadline Ato the next six month period from today=s date.@  The trial court further announced: AThe extension will be granted as
requested.@  The trial court then set the case for final
disposition before a jury on April 8, 2002. 
The trial court entered a written order to that effect on March 1, 2002.


There was another permanency hearing held on March
22, 2002.  Charley=s
attorney called for dismissal claiming that the trial court did not have
jurisdiction because of its failure to enter a signed order in accordance with
Section 263.401.  A.P.=s attorney ad litem also expressed
concern over the claimed lack of compliance. 
The motion to dismiss was denied, and the case later proceeded to trial
before a jury in May 2002.

The first Monday after the expiration of one year
from the date of the temporary orders in this case was December 24, 2001, the
date on which the trial court would be required to dismiss the case unless it
had entered a final order or an extension under Section 263.401(b).  We hold that the trial court=s oral pronouncement satisfied the
requirements of Section 263.401(b).








The trial court rendered its decision when it made
the oral pronouncements at the November 30, 2001, permanency hearing.  When a trial court, in open court, orally
announces its decision, it has rendered judgment.  S & A Restaurant Corporation v. Leal,
892 S.W.2d 855, 857 (Tex.1995).  The
trial court must clearly indicate its intent to render judgment at the time the
words are expressed.  S & A
Restaurant Corporation v. Leal, supra at 858.  Here, in its oral rendition, the trial court
stated that the extension was granted Ato
the next six month period from today=s
date.@  That date would have been May 30, 2002.  In the order, the trial court also set the
date for the final hearing, April 8, 2002, a date within the extension
period.  The case was actually tried
before the May 30 dismissal date.  The
trial court complied with Section 263.401. 
See In re Bishop, 8 S.W.3d 412, 418 (Tex. App. B Waco 1999, no pet=n); cf. In re D.D.M., 116 S.W.3d
224, 230-31 (Tex.App. B
Tyler 2003, no pet=n).  Charley=s
second issue on appeal is overruled. 
Stephanie=s  sole issue on appeal also is overruled.

In his first issue on appeal, Charley argues that
the evidence is both legally and factually insufficient to support the findings
of the jury.  We review these
propositions under a heightened standard.

In
our review of a legal insufficiency claim, we will examine all of the evidence
in the light most favorable to the finding and determine whether a reasonable
trier of fact could have formed a firm belief or conviction that its finding
was true.  In re J.F.C., 96 S.W.3d
256, 266 (Tex.2002).  We must assume that
the fact finder resolved disputed facts in favor of its finding.  In re J.F.C., supra.

In
a factual sufficiency review, we will give due consideration to evidence that
the fact finder could reasonably have found to be clear and convincing.  In re C.H., 89 S.W.3d 17, 25 (Tex.
2002).  We determine whether the evidence
is such that a fact finder could reasonably form a firm belief or conviction
about the truth of the State=s
allegations.  In re C.H., supra.  We also consider whether any disputed
evidence is such that a reasonable fact finder could not have resolved that
disputed evidence in favor of its finding. 
In re J.F.C., supra at 266.

The
Department sought termination under TEX. FAM. CODE ANN. '161.001(1)(D)
& (E) (Vernon 2002).  Section
161.001(1)(D) & (E) allows for termination if the Department shows by clear
and convincing evidence: 

(1)
That the parent has:

 

(D)
knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which endanger the physical or emotional well‑being of the
child; or 

 

(E)
engaged in conduct or knowingly placed the child with persons who engaged in
conduct which endangers the physical or emotional well‑being of the
child.

 

There
must also be a finding that termination is in the best interest of the child.








AEndanger@
means more than a threat of metaphysical injury or a less than ideal
environment, but the conduct need not actually injure the child, nor is it
necessary that the conduct be directed at the child.  AEndanger@ Ameans
to expose to loss or injury;  to
jeopardize.@  Texas Department of Human Services v.
Boyd, 727 S.W.2d 531, 533 (Tex.1987). 
The Department need not establish the specific danger to the child=s well-being as an independent
proposition; the danger may be inferred from parental misconduct.  In the Interest of J.J. and K.J., 911
S.W.2d 437, 440 (Tex.App. B
Texarkana 1995, writ den=d).  Boyd also instructs us that, if the
evidence including evidence of incarceration, shows that a parent has engaged
in a course of conduct that has the effect of endangering the physical or
emotional well‑being of the child, an affirmative finding under Section
161.001(1)(E) is proper.  We hold that
the same is true as to Section 161.001(1)(D). 


We
will examine the record and determine, in accordance with the standards set out
above, whether the Department met its burden of proof.

Charley
did not attend the termination hearing; and there is, therefore, no testimony
from him in the record.

The
record does reveal that on November 25, 2000, Stephanie=s
aunt learned that Stephanie=s
three children were home alone.[1]  She telephoned the Brownwood Police
Department.  Officer Scott Byrd went to
Stephanie=s
home.  He called AChild
Protective Services,@
and the children were taken to the Brownwood Police Station.  The children were given food at the Brownwood
Police Department but did not appear to be extremely hungry.  A.P. was later placed in foster care. 

Officer
Byrd testified that the day he went to Stephanie=s
home was a cold day and that the children were Abarely
clothed.@  The home was very dirty, and clothes and
trash were everywhere.  Old food was
lying on the floor where the children slept. 
Roaches had infested the house. 
While Officer Byrd found almost no edible food in the house, he did find
some eggs and beer.  There was a smell of
natural gas throughout the whole house. 
The only heat in the house came from one gas heater in the front room of
the house.  A.P.=s
aunt testified that the stove was one with an open flame without any type of
grill on it.  There had been no water in
the house for the month of November.  








Emily
Alford testified that she went to Stephanie=s
home to get some things for the children. 
She saw some dirty dishes in the sink, some canned goods, some clothes
piled around the house, and some broken windows covered with plastic and
cardboard.  

Stephanie
and Charley were married on February 14, 1996, and they separated in July
2000.  Stephanie testified that, on the
day that the children were left alone, she had gone to Burger King to get
food.  When she arrived home, her
children were gone.  She finally located
them at the Brownwood Police Department. 
Stephanie testified that she was told to leave or that she would be
arrested for Achild
abandonment.@  Stephanie said that they were in the process
of moving and that that was why her house looked the way that it did.

Dana
O=Conner with Child Protective Services
testified that neither Charley nor Stephanie complied with service plans
provided by the Department.  They never
attended parenting classes.  Stephanie
did not keep a drug assessment appointment, missed appointments for
psychological evaluations, and did not live in any one place for any
significant period of time.  Stephanie
lived in 3 homes from January until March during one of the years; and, in the
first 40 months of A.P.=s
life, he lived in 13 different places. 
Charley never attended any counseling sessions concerning his history of
family violence.  Further, he did not
refrain from criminal acts and criminal elements; he did not undergo a drug and
alcohol assessment; and he did not participate in drug and alcohol counseling.

Another
employee of the Child Protective Services, Monica Cole, testified that, during
her meetings with Charley, Charley smelled of alcohol.  Charley would end visits with A.P. in such a
manner as to bring fault upon A.P., and he would leave A.P. crying
hysterically.  Charley would also make
inappropriate promises to A.P. that the family 
would be getting back together. 
Charley=s visits
with A.P. became more sporadic by March 2001. 
By September 2001, there was neither contact between Charley and A.P.
nor between Charley and the Department. 

Pam
King was A.P.=s foster
mother.  She told the jury that, when she
first received A.P., he had lice and poor bathroom habits.  A.P. was underweight, anemic, and would often
cry.  A.P. was afraid that King would
leave him.








Russell
Fisher was a court-appointed special advocate for A.P.  Fisher performed an independent investigation
in this case.  He testified as to the
lifestyles of A.P.=s parents
and to the fact that Charley and Stephanie had both placed A.P in dangerous
situations.  It was Fisher=s opinion that A.P. would follow their
history of violence, alcohol abuse, and drug abuse if placed with the parents.

Charley=s propensity to violence was further
testified to by William Michael Phaup, one of Stephanie=s
boyfriends.  Phaup is also K.P.=s father.  On one occasion, Charley assaulted him with a
motorcycle chain.  Charley split his eye,
kicked in some ribs, and broke his shinbone. 
Further testimony as to Charley=s
violence came from his mother, also a victim of Charley=s
assaultive nature.

Stephanie
had also assaulted Phaup.  On one
occasion, she had ruptured his spleen by hitting him with an aluminum baseball
bat.  On other occasions, she had
ruptured his eardrum and had broken his nose.

Stephanie=s mother, Rosa Hoffman, also testified
to Charley=s
reputation as a violent, abusive person who regularly drank and did drugs.  Stephanie=s
aunt, Diane Anderson, joined in that opinion and further offered her belief
that she did not know whether Stephanie could ever change and become a better
person.

Stephanie
had been in and out of jail during A.P.=s
life.  The evidence shows that, during
the first 36 months of A.P.=s
life, Stephanie spent 18 of those months incarcerated and had been out of
prison only 7 months when her children were removed from the home.  In less than a year after her children were
taken, she was again incarcerated after receiving a 4-year sentence on August
23, 2001.








Stephanie
testified that she and Charley used methamphetamine, heroin, cocaine, and
mari-huana.  They also smoked and
injected Aa lot of
crack@ at their
house. They used these illegal drugs while the children were in the house.  Charley also had a problem with alcohol and
would drink Aa case, a
case-and-a-half@ of beer on
an average day Afrom the
time he [woke up] in the morning until the time [he went] to bed and in
between.@  Charley had a habit of carrying guns and
knives.  Both Stephanie and Charley had
been incarcerated in the past.  Although
by Stephanie=s own
testimony Charley had physically abused her, had abused drugs and alcohol, had
threatened her with a gun, had physically assaulted his other children, had
physically assaulted Abusiness
associates@ at their
home, she had talked to Charley, also known as ANasty,@ about getting back together.  Charley=s
nickname became ANasty@ after he had been in a fight and had
bitten off his opponent=s
nose and swallowed it; he had this nickname tattooed on his body.  Stephanie told the jury that she would love
Charley until the day that she died.

We
find that the evidence is both legally and factually sufficient, under the
standards that we have outlined, to support the termination of Charley=s parent-child relationship under
Section 161.001 (1)(D) & (E). 
Charley=s first
issue on appeal, in both of its parts, is overruled.

The
judgment of the trial court is affirmed.

 

JIM
R. WRIGHT

JUSTICE

 

September
30, 2004

Panel
consists of:  Arnot, C.J., and

Wright,
J., and McCall, J.         











[1]At the time, Stephanie had three children who lived
with her:  9-year-old S.K, 7-year-old
K.P., and 3-year old A.P. (the child involved in this appeal). All three
children have different fathers, and conservatorship of S.K. and K.P. was
awarded to their respective fathers. 
This appeal is limited to A.P.